**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LILIUM GROUP LLC**, individually and on behalf of all others similarly situated, | ) ) ) |
| *Plaintiff,* | ) ) CASE NO. _____ |
| v. | ) ) **COMPLAINT—CLASS ACTION** |
| **PENSKE TRUCK LEASING CO., L.P.** | ) ) **JURY TRIAL DEMANDED** |
| *Defendant.* | ) ) ) ) ) ) ) ) ) |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Lilium Group LLC ("Lilium Group" or "Plaintiff"), as assignee of XBL Industrial Materials, LLC ("XIM"), brings this action against Defendant Penske Truck Leasing Co., L.P. ("Penske" or "Defendant") on behalf of itself and all others similarly situated and makes the following allegations in this Class Action Complaint:

**Preliminary Statement and Summary of the Action**

1.      Plaintiff brings this nationwide class action to address and rectify Penske's abusive business practices harming its thousands of full-service lease customers. Penske has a pattern and practice of overcharging its customers for services on their trucks that are Penske's contractual responsibility. Penske's diagnosis and service of its customer's trucks routinely causes unreasonable and excessive downtime in the trucks' operations while the customers are required to continue paying for the trucks. This stops now.

2.      Trucking is the backbone of American industry. Over seventy percent (70%) of goods in the U.S. are delivered by trucks, driving trillions of dollars in annual economic value to

the U.S. economy.[1]  According to the Federal Motor Carrier Safety Administration, there are over two million motor carrier companies in the U.S. operating more than eight million trucks.[2]

3.      Trucking is a capital-intensive business that requires significant investment in rolling stock.  For example, modern Class 8 trucks (often called tractors or power units in industry parlance), which are among the most common types of heavy commercial trucks in the U.S., are increasingly complex machines that require significant preventative and unscheduled maintenance to deliver reliable service.  There are around 3.7 million Class 8 trucks in operation, based on industry data.[3]

4.      In broad categories, Class 8 and other trucks are used for commercial purposes by companies and individuals across the country.  These range from shipping and logistics companies that provide transportation services as their primary business, to retailers or other businesses that use trucks to ship their inventory or assets, to small businesses or individual contractors operating small fleets of trucks or even a single truck for hire.

5.      Trucks are held in four primary structures: (i) outright ownership, (ii) rentals, (iii) finance leases, and (iv) full-service leases.

6.      Full-service leased trucks are central to this action.  Full-service truck leasing is unique among the above holding structures because it offers a value proposition to companies that operate trucks by combining the capital recovery of finance leases with contractual service

---

[1] *See* BUREAU OF TRANSP. STATISTICS, *Commodity Flow Survey 2017* (Dec. 10, 2018), https://www.bts.gov/newsroom/commodity-flow-survey-2017.

[2] FED. MOTOR CARRIER SAFETY ADMIN., *Registration Statistics* (Feb. 27, 2026), https://ai.fmcsa.dot.gov/RegistrationStatistics.

[3] *See, e.g.*, Trucknews.com, *3.7 million Class 8 vehicles on U.S. roads in 2021* (Sept. 29, 2023), https://www.trucknews.com/transportation/3-7-million-class-8-vehicles-on-u-s-roads-in-2021/1003178557/.

provided by (or at the expense of) the lessor for maintenance and other services. That combination creates a predictable, defined cost structure for each truck in an operator's fleet. By contrast, an ordinary finance lease without a full-service component renders the lessee responsible for maintenance and other services for the trucks—services it would need to either provide on its own (by hiring mechanics and technicians and maintaining a service department and facilities) or obtain from a third-party service provider.

7.     Accordingly, and on information and belief, a full-service truck leasing customer would generally pay higher monthly lease payments, as compared to a finance leasing customer, for the same truck or trucks. This is because a full-service leasing customer's rates reflect the cost to the lessor of maintaining the vehicle(s) over time, whereas a finance leasing customer pays lower monthly lease payments but covers all maintenance costs by itself.

8.     Companies that enter full-service leases for their businesses do so for a host of reasons, including conserving equity capital, ensuring predictable costs, and maintaining a high-performing fleet while reducing the administrative and operational obligations relating to maintenance, downtime management, and ownership of the trucks.

9.     Providing maintenance for trucks requires a major investment in facilities, staff, equipment, overhead, and administrative resources. These costs also typically increase as a truck or fleet of trucks ages. As a result, the full-service leasing structure should benefit both the lessee and the lessor. The lessee's rental costs remain consistent and predictable, both when the trucks are newer and require less maintenance and when the trucks are older and require more maintenance. Meanwhile, the lessor receives consistent payments that should allow it to build a reserve when the trucks are newer and maintenance costs are lower. Similarly, by receiving consistent monthly payments for each truck, lessors that lease a fleet of trucks under full-service

leases should be able to offset higher maintenance costs of older vehicles requiring more maintenance with the additional net proceeds from newer vehicles requiring less maintenance.

10. The market for full-service truck leasing in the U.S. is dominated by two major national truck leasing companies, the larger of which is Defendant Penske.

11. Penske's fleet consists of over 400,000 trucks, ranging from light-duty cargo vans, to medium box trucks, to heavy duty semi-tractor trucks.[4]

12. By contrast, customers that lease trucks are generally much smaller companies, most leasing 10 trucks or fewer.[5]

13. Penske's website touts that it is its customers' "**trusted transportation partner**."[6] Consistent with certain of the reasons why its customers seek to lease trucks in the first place, Penske advertises that "[m]aintenance is included in Penske's full-service leases, minimizing the risk of unexpected maintenance expenses."[7]

14. Penske also promises its full-service leasing customers "efficient operations," including that its "proactive approach to maintenance keeps your trucks on the road where they

---

[4] *See* Penske, *Our Companies*, https://www.penske.com/our-companies ("Penske Truck Leasing … maintains a fleet of approximately 433,000 vehicles"); Penske Truck Leasing, *Vehicle Leasing Options*, https://www.pensketruckleasing.com/truck-leasing/vehicle-options/ (describing types of trucks available) (last visited Mar. 17, 2026).

[5] *See* American Trucking Associations, *Economics and Industry Data*, https://www.trucking.org/economics-and-industry-data (last visited Mar. 17, 2026).

[6] Penske Truck Leasing, *Penske Truck Leasing*, https://www.pensketruckleasing.com/ (last visited Mar. 17, 2026).

[7] Penske Truck Leasing, *Lease vs. Own:  How do You Choose?*, https://www.pensketruckleasing.com/truck-leasing/leasing-benefits/lease-vs-own/ (last visited Mar. 17, 2026).

belong"; that there is "less downtime because all maintenance is done in the same location"; and that "even when breakdowns do occur, customers have very little downtime."[8]

15. But, importantly, Penske demands complete control over all service work performed on trucks leased to its customers under full-service leases. Penske requires that it perform or designate who performs all service work, both preventative and non-preventative, on the trucks. Penske also prohibits customers from having service performed by anyone other than Penske or Penske's designees.

16. Penske maintains and controls the staff at its service centers, which are the principal locations where its customers may bring its trucks for service (although Penske can, and sometimes does, designate third-party providers that it selects for certain service work).

17. Penske's promise of adequate service, which is reflected in its standard full-service leasing contracts, along with its control over the service process, means that its full-service leasing customers rely on Penske for service and do not have maintenance and associated administrative capabilities in house for the portion of their fleet that runs under Penske full-service leases.

18. As the owner, lessor, and exclusive servicer of its customers' trucks, Penske holds immense power over its full-service leasing customers. Those customers rely on Penske—both for the trucks themselves and performance of the services needed to keep the trucks running—and because losing access to or use of their trucks for any reason can inflict substantial harm on their businesses.

19. As detailed in this Complaint, Penske has abused that power through a series of practices that deprive its customers of the benefit of the bargain and advantages of full-service

---

[8] Penske Truck Leasing, *Efficient Fleet Operations*, https://www.pensketruckleasing.com/truck-leasing/leasing-benefits/efficient-operations/ (last visited Mar. 17, 2026).

commercial truck leasing, including avoiding the costs of preventative maintenance and other service, and receiving timely and efficient service—benefits for which customers have contracted in exchange for their continued monthly lease payments to Penske.

20.    This case is brought to address Penske's abuses of its current and former full-service leasing customers over the course of several years and to rectify the exorbitant damages its customers have suffered as a result.

21.    As detailed herein, Penske has routinely charged full-service leasing customers for service work on its trucks that are Penske's responsibility under Penske's standard full-service lease agreement.  Penske's standard agreement requires that the customer pay for repairs of non-ordinary damage to the trucks caused by the customer's misuse or by third parties (e.g., collisions, theft, vandalism, etc.), *but* Penske is required to pay the costs of all routine and preventative maintenance, including all replacements and repairs necessary to keep the trucks in good working condition.  However, Penske *shifts* routine and ordinary maintenance costs that would otherwise be Penske's responsibility onto its customers by charging for the work as though the costs were damage repair.

22.    Penske is able to shift significant costs to its full-service leasing customers in this manner because of its complete control over the service process, which allows it to unilaterally determine whether a given charge is characterized as routine maintenance for which Penske is responsible or damage repair for which it bills customers.  Penske's control over the service process similarly enables it to determine what information is provided to customers regarding service work that was performed on the trucks.  Penske abuses this control by providing inadequate information to its customers regarding services performed, so that customers are unable to ascertain if or why the service charges are allegedly the customer's responsibility.

23.     An independent issue that harms customers arises from Penske's failure to adequately staff its vehicle service centers.  This issue results in Penske regularly failing to timely complete service work when leased trucks are in Penske's service centers, causing excessive downtime, crippling delays, and economic losses to its customers' businesses.  Accordingly, full-service leasing customers receive less usage of the leased trucks than they pay for.

24.     Penske representatives at the local and corporate level have admitted to these practices, including that: (a) Penske provides inadequate information to customers that fails to enable them to determine why they are responsible for service charges, (b) Penske lacks adequate staffing to timely complete service work, and (c) the staffing issues have resulted in delays across its full-service leasing customer base.

25.     Customers can do little to address these abuses.  Penske receives payment for service charges by automatically debiting the full amount of the charges from its customers' bank accounts (without the possibility of any deductions for disputed charges) and without meaningful opportunity for the customer to raise a dispute or even to ask for more information about the charges prior to Penske taking the funds by automatic transfers.

26.     While Penske's wrongful charges are significant when added up over time, it is rarely economical or feasible for customers, focused on running their own businesses, to dispute charges on an individual basis.  If a customer does want to dispute charges by withholding its payment, it runs the risk of defaulting on the lease, which can result in ruinous penalties under the lease agreement.  As a consequence, customers are left having to pay for wrongful charges in full, and then having to dispute the charges with Penske after the fact and hope they can convince Penske to refund the charges—a determination which is within Penske's sole discretion.

27.     On information and belief, Penske rarely issues refunds. And because Penske already has the customers' payment, it can—and does—simply refuse to engage with customers' disputes. Penske masks its refusal behind its bureaucracy, leaving the customer with no recourse. Meanwhile, individual wrongful charges are rarely if ever sizeable enough to warrant the customer taking legal action. As a consequence, Penske, which promotes itself as its customers' trusted partner in transportation, has transformed the service component of its full-service truck leases from a benefit intended for its customers into a significant profit center for itself.

28.     There is no incentive, short of class litigation, for Penske to address these problems that plague its customers and surreptitiously erode the purpose and value of full-service truck leasing agreements in the first instance. To shift costs away from itself, Penske has reason to charge customers for as much service work as possible.

29.     Penske has no reason to remedy its ongoing service delays either, because Penske collects its lease payments on the trucks regardless of the time that the trucks are not operational due to service downtime. Penske does not provide discounts or reimbursements to customers for monthly lease payments, even when a truck is subjected to excessive or unreasonable downtime.

30.     There is little if any competitive pressure on Penske to change its practices. Full-service truck leases are typically multi-year agreements for commercial reasons that are intended to suit both the lessee and lessor. And it is often commercially unfeasible to terminate a commercial truck lease, because doing so would force the customer to immediately take its trucks out of operation in order to forfeit them back to Penske, while simultaneously procuring and deploying a new fleet of trucks across its operations. Many customers are forced to bear the costs and losses caused by Penske's abusive practices because they cannot afford the cost and disruption to their businesses that would result from terminating a Penske lease.

31.    Plaintiff thus brings this class action on behalf of Penske's full-service commercial truck leasing customers to finally hold Penske accountable.

32.    Plaintiff requests that the Court certify this case as a class action and render a class-wide judgment for damages against Penske, along with all interest, costs, and attorney's fees available under the law.

## Parties

### I.    Plaintiff Lilium Group, LLC

33.    Plaintiff Lilium Group, LLC is a limited liability company formed under the laws of the state of Texas.  Its headquarters and principal place of business are located in Houston, Texas.

34.    Plaintiff's sole member is Hazina LLC.  Hazina LLC is a limited liability company formed under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Houston, Texas.  Hazina LLC has two individual members, both of whom are residents and citizens of Texas.

35.    As set forth in further detail below, Plaintiff asserts claims in this case against Penske as an assignee of one of its former portfolio entities.  *See infra* ¶¶ 148–150.

36.    Plaintiff seeks to represent a class of similarly situated businesses or other entities that are Penske's current and former full-service commercial truck leasing customers as defined herein.  On information and belief, Plaintiff expects the class to be nationwide.

### II.    Defendant Penske Truck Leasing Co., L.P.

37.    Defendant Penske Truck Leasing Co., L.P. is a limited partnership formed under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Reading, Pennsylvania.  Penske can be served by service on its registered agent, Corporation Service Company, 2595 Interstate Drive, Suite 103 Harrisburg, PA 17110.  On information and

belief, Defendant's limited partners are Penske Corporation, Penske Automotive Group, Inc., and Mitsui & Co. Ltd.  On information and belief, Defendant's general partner is PTL GP, LLC.

38.     Penske Corporation is a corporation organized under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Bloomfield Hills, Michigan.

39.     Penske Automotive Group, Inc. is a corporation organized under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Bloomfield Hills, Michigan.

40.     Mitsui & Co., Ltd. is a corporation organized under the laws of Japan.  Its headquarters and principal place of business are located in Tokyo, Japan.

41.     PTL GP, LLC is a limited liability company formed under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Reading, Pennsylvania.

42.     The sole managing member of PTL GP, LLC is LJ VP Holdings LLC.

43.     LJ VP Holdings LLC is a limited liability company formed under the laws of the state of Delaware.  Its headquarters and principal place of business are located in Reading, Pennsylvania.

44.     LJ VP Holdings LLC has two members, Penske Corporation and Penske Automotive Group, Inc.

**Jurisdiction and Venue**

45.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

46.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant; on information and belief, there are more than 100 class

members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

47.    This Court has personal jurisdiction over Penske because its headquarters and principal place of business are located in Pennsylvania.

48.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because Penske's headquarters and principal place of business are located in Reading, Pennsylvania.

## Background Facts

49.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

### I.    Commercial Truck Leasing

50.    Thousands of companies across the U.S. operate trucks, such as cargo vans, box trucks, and semi-tractor trucks, to provide all manner of transportation, delivery, and other services.  These include shipping and freight companies, retailers who transport their own inventory, and a variety of other businesses needing to transport products, equipment, consumer goods or other items.

51.    Many of these companies do not own, and instead lease, the trucks they operate. Trucks are depreciating assets, and the costs of purchasing them outright can be excessive or prohibitive for many companies.  In contrast to ownership, leasing can also provide additional flexibility to companies to scale up or down, avoid the burden and expense of selling used trucks, and eliminate some of the administrative burdens of owning a fleet of trucks.

52.    Given the number of companies that need trucks for their businesses, and the relative benefits to those companies that commercial truck leasing can provide, commercial truck

leasing is big business.  It has been growing steadily and generates over $30 billion in annual revenue in the U.S.[9]

## II.    Full-Service Truck Leases

53.    Apart from short-term rental agreements, there are generally two types of commercial truck leases:  finance leases and full-service leases.  A finance lease allows the customer to simply lease the trucks themselves.  The lessor continues to own the trucks and gets any tax benefits of owning the trucks.  But the customer is responsible for all costs of maintenance and service for the trucks as they arise.  A finance lease would be expected to give the customer the benefit of paying lower fixed costs for the trucks, because the rental rates do not include the cost to the owner of the maintenance and service that the trucks will need over the period of use (since the customer is paying those costs itself).  But at the same time, a finance lease forces the customer to bear the risk and costs of all maintenance and service obligations for the trucks.

54.    By contrast, a full-service lease allows the customer to lease the trucks while the lessor remains responsible for the costs of maintenance for the trucks.  The lessor continues to own the trucks for the duration of the lease (which may be for a number of years or miles), and the trucks would be returned to the lessor after the lease concludes.  Under the full-service leasing model, the lessor owns and services the trucks and gets any tax benefits of owning the trucks, while the lessee is making lease payments effectively in exchange for using the trucks during the lease period.

55.    A full-service lease would be expected to entail higher fixed rental rates charged to the customer, as compared to a finance lease, because rental rates for a full-service lease include

---

[9] *See, e.g.*, KPMG, *Truck & Trailer Rental and Leasing Industry Update Q2 2023*, https://corpor atefinance.kpmg.com/us/en/insights/2023/truck-trailer-leasing-industry-update.html (last visited Mar. 17, 2026).

the cost to the lessor of maintaining the vehicles over time.  However, even though the customer is paying a premium, the full-service leasing model would also be expected to give the customer the benefit of cost predictability by allowing for consistent costs over the period of use, even as the trucks require more, and more costly, service work as they age.

56.     Trucking industry analyses have pointed to full-service truck leasing as a means for operators to achieve cost savings and other benefits over time.[10]

### III.     Penske

57.     Penske is the largest U.S. commercial truck leasing company.

58.     Penske's fleet consists of over 400,000 vehicles, and it maintains over 1,000 service locations nationwide.[11]

59.     Penske's trucks are on the road all across the U.S.  While Penske's rental and leasing brand is seen on the familiar yellow trucks with blue stripes, trucks that Penske leases often display the customer's branding or other designs at the customer's request.  Thus, while Penske leases hundreds of thousands of trucks to customers, it would not be apparent from looking at the trucks that they are actually owned by Penske.

60.     Penske touts that it is a trusted partner in transportation and targets its advertising to extoll the benefits of its full-service truck leases.  For example, Penske claims that "[l]easing reduces maintenance and repair costs," such as "tires, oil changes and routine inspections," and

---

[10] *See, e.g.*, Fleet Advantage, *Latest Fleet Advantage Equipment Lease vs Buy Study Showing Operating Cost Savings for Private Fleets and For-Hire Carriers*, https://www.fleetadvantage.com/press-releases/fleet-advantage-unveils-latest-equipment-lease-vs-purchase-study-showcasing-operating-cost-savings-for-private-fleets-and-for-hire-carriers (Oct. 10, 2017); KPMG, *Lease or Buy?  Evaluating the Rising Costs of Truck Fleet Ownership* (2024), https://kpmg.com/kpmg-us/content/dam/kpmg/pdf/2024/fleet-cost-ownership-brief-final.pdf.

[11] Penske, *Our Companies*, https://www.penske.com/our-companies (last visited Mar. 17, 2026).

that "[a] full-service lease will cover maintenance and repairs at predictable monthly costs."[12] Similarly, Penske claims that "[a] full-service lease with Penske is a smart alternative for organizations that want to reduce repair, maintenance, replacement and staffing costs."[13]

**IV.     The Vehicle Lease Service Agreement (VLSA)**

61.     Penske offers full-service leases to commercial trucking customers.  In exchange for the customers' lease payments, Penske provides the trucks and agrees to service those trucks.

62.     Unlike ordinary vehicles, semi-tractor trailer trucks and other trucks used in the transportation industry are often operated over long distances, for extended periods of time, and in various road and weather conditions.  As a result, these trucks require frequent service—including inspections, maintenance, replacements, and repairs—to remain in safe, working condition. Accordingly, the service component is a key aspect of full-service truck leasing agreements like those between Penske and its customers.[14]

63.     Penske uses a standard form contract for its truck leasing and services agreements, called the Vehicle Lease Service Agreement ("VLSA").  On information and belief, Penske has used the standard form VLSA for several years, making only minor and non-material adjustments to it over time.  A copy of Penske's VLSA is attached as **Exhibit A.**

---

[12] Penske Truck Leasing, *Leasing Benefits*, https://www.pensketruckleasing.com/truck-leasing/leasing-benefits/ (last visited Mar. 17, 2026).

[13] Penske Truck Leasing, *Leasing Services*, https://www.pensketruckleasing.com/truck-leasing/leasing-services/ (last visited Mar. 17, 2026).

[14] *See* Penske Truck Leasing, *What Is Preventative Maintenance and Why Is It Crucial?*, https://www.pensketruckleasing.com/resources/resource-library/what-is-preventive-maintenance/ (last visited Mar. 17, 2026).

64.     On information and belief, either all or the vast majority of Penske's full service commercial truck leasing customers lease their trucks under the VLSA or a similar form agreement.

65.     The VLSA allows for some modifications to meet customers' needs.  There are, for example, standard amendments that Penske and customers often attach to the VLSA.  The VLSA may, for example, reflect modification of the trucks to fit the customer's needs.   These modifications might include things like installing lighting, refrigeration, or temperature controls needed for certain types of cargo; installing equipment for loading, unloading, and securing the cargo; or integrating technology.

66.     The VLSA also typically includes schedules reflecting the individual customer's particular lease arrangement (e.g., type and number of vehicles and rental rates).

**A.     Service Charges Under the VLSA**

67.     On information and belief, Penske's full-service truck leasing customers' VLSAs employ the same or materially similar terms with regard to the division of responsibility for the costs of servicing the trucks.

68.     Under the VLSA, Penske is required to pay the expenses of:

a.     All preventative maintenance, replacement parts and repairs necessary to keep the Vehicles in good repair and operating condition;

b.     Oil and lubricants necessary for the efficient operation of the Vehicles;

c.     All necessary tires as a result of normal wear and tear and tire failures not attributable to Misuse or other violation of the VLSA;

d.     Road service because of mechanical and tire failures not attributable to Misuse or other violation of the VLSA;

e.     Periodic exterior washing; and

f.     Initial painting and lettering of each Vehicle at a cost not exceeding the per-vehicle allowance specified in the attached Schedules.  *See* Ex. A art. 2.

69.     By contrast, the VLSA obligates customers to pay for repair of damage to a vehicle caused by the customer, third parties, or unusual events.  This damage includes physical damage, such as damage from misuse, casualty, collision, upset, fire, theft, malicious mischief, vandalism, graffiti, glass breakage, or mysterious disappearance.  *Id.* at art. 9.a–b.  In the event of such damage, the VLSA requires the customer to pay for all amounts necessary to restore the vehicle to good working order.

70.     The VLSA terms give Penske near-total control over servicing the trucks.  The customer is prohibited from allowing anyone other than Penske (or Penske's authorized designees) to make repairs to leased vehicles.  *Id.* at art. 3.  The customer is required to return each vehicle to a Penske service location on a monthly basis (or at other agreed-upon or scheduled intervals) for inspections, preventative maintenance, and repairs.  *Id.*  And the customer's drivers are required to notify Penske promptly of any issues with a vehicle.  *Id.*

**B.     Payment of Charges Under the VLSA**

71.     On information and belief, Penske's commercial truck leasing customers' VLSAs employ the same or materially similar terms with regard to payments for charges such as monthly lease payments and damage-related service charges.

72.     The VLSA requires that the customer pays Penske all charges (including lease charges and any other charges, including repair costs for which the customer is responsible) by specific deadlines.  *Id.* at art. 7.b.

73.     The VLSA also provides that "unless Customer protests the correctness of any invoice within thirty (30) days of its receipt, such invoice shall be presumed to be correct."  *Id.*  There is no modification of the payment timeline in situations where payments are in dispute.

Thus, even if a customer raises a dispute, full payment (including the disputed amount) is still due by the contract deadline.

74.    Penske also requires customers to allow Penske to automatically debit their bank or other financial accounts via Automated Clearing House (ACH) draws that Penske initiates.

75.    The payment deadline under the VLSA is strict, as are the consequences of non-payment.  Failure to pay any charges when due constitutes an "event of default" under the VLSA. *Id.* at art. 13.a.

76.    Triggering an event of default under the VLSA allows Penske to exercise remedies including:

   a.    Immediately terminating the VLSA;

   b.    Being relieved of all of Penske's obligations under the VLSA;

   c.    Taking immediate possession of the trucks wherever they are located, with or without any court order or legal process and without any liability to the customer for any damages caused by the repossession;

   d.    Taking possession of, and holding, any inventory or property of the customer inside of the truck and storing it at the customer's sole cost and risk of loss;

   e.    Requiring the customer to either purchase the trucks or make an "Alternative Payment" equal to the difference between the trucks' depreciated value and the fair market value;

   f.    Requiring the customer to pay not only outstanding lease charges (plus interest), but also future lease charges for up to 60 days thereafter; and

   g.    Filing suit to obtain any remedies under the VLSA, plus attorney's fees and expenses. *See id.* at art. 13.b–14.a.

77.    If exercised, the above remedies would be onerous, if not ruinous, for Penske's customers.  For some customers, having to immediately surrender all trucks would, as a practical matter, irreparably devastate their businesses.  Other customers would simply not be able to afford

the cost of being forced to purchase the trucks from Penske or the other immediate financial consequences that Penske can impose in the event of a default.

78.    Accordingly, Penske's VLSA customers not only rely on Penske for their trucks, but they are also subject to Penske's unilateral decision-making.  Any non-payment of charges— even charges that might be incorrect—would either bankrupt or effectively end many customers' businesses if Penske exercises its contractual remedies.

### C.    Penske is Required to Timely Complete Service Work

79.    Under the VLSA, Penske and the customer agree that "time is of the essence."  *Id.* at art. 20.  Thus, the VLSA gives customers a short payment deadline and it requires timely service by Penske.

80.    Customers lease trucks from Penske for use in their businesses and need service work to be timely completed so that the trucks can return to operation for which they were leased in the first instance.

81.    Under "Penske's Obligations," the VLSA provides that in the event a vehicle is disabled, Penske shall repair the vehicle "within a reasonable period of time" after receiving notification.  *Id*. at art. 2.

82.    While the VLSA does not contain a similar "reasonable period of time" clause with respect to maintenance work or repairs of damage that does not disable the vehicle, the VLSA still requires that those types of services be completed promptly.  Completion of service in a reasonable time is both industry custom and necessary to provide customers with the benefit of their bargain, which is reflected in the VLSA's overarching provision that "[t]ime shall be of the essence of this VLSA."  *Id*. at art. 20.  And, it is reasonable to expect that service work for routine or preventative maintenance or for minor repairs would be completed in short order.  Moreover, given the nature

of the industry, standard repair work including diagnoses have industry-standard times for service delivery.[15]

## V.   Understaffing at Penske Causes Extensive and Unreasonable Service Delays and Truck Downtime

83.   Beginning at least as early as mid 2018, and on information and belief, Penske began experiencing major staffing shortages at its service center locations across the country, particularly for trucks mechanics and technicians—the employees that actually perform service work on the vehicles.  Penske has specifically admitted their staffing shortage in discussions regarding the unreasonable service delays and extensive truck downtime that are the subject of Plaintiff's claims described in more detail below.

84.   On information and belief, Penske's staffing shortages have worsened over time and Penske has not been able to secure adequate staffing levels of mechanics and technicians to keep up with its contractual service obligations to its customers under VLSAs.

85.   Penske's service centers have a high volume of service work needing to be timely completed.  The VLSA requires that each truck be returned to a service center periodically for routine/preventative maintenance.  This requirement means that every truck leased under a full-service VLSA—potentially hundreds of thousands—is being brought to one of around 1,000 Penske service centers nationwide at scheduled intervals (usually at least every few months or based on mileage).  And these visits would not include separate and additional service visits for unscheduled work that may be needed in between periodic visits.

---

[15] *See, e.g.*, American Trucking Associations, Technology & Maintenance Council, *Average Standard Repair Times (SRT) for 103 Commonly Performed Labor Tasks in Fleet and Service Provider Operations (2025)* (May 19, 2025), https://tmc.trucking.org/sites/default/files/TMC_STD_REPAIR_TIME_SURVEY_NO6.pdf.

86.     Despite the high volume, Penske agreed under the VLSA to timely complete all of this work.  As a consequence, it is imperative that Penske maintain adequate staffing and otherwise operate its service centers to comply with its timely service obligations.

87.     Penske's failure to properly operate its service centers, including by maintaining adequate staffing, has resulted in extensive delays in completing service work on its VLSA customers' trucks.

88.     While major or complex repairs might reasonably take additional time, Penske is contractually required to expeditiously complete most preventative and routine maintenance work (e.g., inspections, oil changes, filter changes, fluid checks, brake adjustments, tire rotations, chassis lubrication, battery testing, etc.).

89.     Similarly, most trucks need various parts to be replaced on a routine basis (e.g., brake pads, drums, rotors, tires, filters, belts, hoses, shock absorbers, alternators, batteries, etc.). Penske is reasonably expected to maintain at its service centers adequate supplies of these types of commonly-needed parts and is reasonably expected to promptly replace such parts.  Penske's full-service leasing customers rely on Penske meeting these expectations.

90.     Yet, on information and belief, not only does Penske routinely fail to complete even these routine types of services and replacements in a reasonable and timely fashion, Penske is often so short-staffed that it struggles with diagnostic work necessary for customers to decide whether to use a different truck for a job or make other similar operational decisions.  In other words, once a truck is brought to a Penske service location, it may take multiple days for Penske to even determine what service work needs to be done.  This delay in the diagnostic process is in addition to any delay in actually completing the service work itself.

91.     Penske's failure to timely complete diagnostics and service work on its VLSA customers' trucks is a breach of the "reasonable period of time" and "time is of the essence" express requirements under the VLSA, as well as equivalent terms implied by industry custom and the covenant of good faith and fair dealing.

92.     Penske's failure to timely complete diagnostics and service work results in excessive days of truck downtime, which forces customers to pay monthly lease payments for trucks that are not in operation and sitting idly in service centers awaiting completion.

93.     In addition to the monthly lease payments, customers subjected to extensive vehicle downtime additionally suffer loss of business and profit, because the trucks are not in operation in their businesses.

94.     Penske has admitted to the aforementioned issues, and its own employees have expressed frustration with staffing shortages and unreasonable and excessive service delays.  It has have explained that these are widespread issues impacting most or all of Penske's truck leasing customers.

95.     Despite this knowledge, Penske continued to tout its service offerings and capabilities and induce new customers to enter into VLSAs with Penske.  Penske was affirmatively marketing to new VLSA customers, and attempting to expand its business and customer base, while knowing that it lacked the resources to service its existing customers or comply with its existing contractual obligations.

**VI.     Penske Wrongfully Charges Customers for Service Expenses in Breach of the VLSA**

96.     Separate from its delays in completing service work, Penske also regularly breaches its VLSAs by taking payment for charges for which it, not the customer, is contractually responsible under the VLSA.

97.     Despite the VLSA's delineation between maintenance expenses (for which Penske is responsible) and damage repair costs (for which the customer is responsible),[16] on information and belief, Penske maintains a pattern and practice of regularly categorizing routine and preventative maintenance and replacements as damage repairs so that the customer is required to pay under the VLSA.

98.     Penske's routine wrongful categorization of service charges allows it to collect lease payments from customers, but avoid incurring the service costs that Penske is required to pay under the VLSA, and shift the actual out-of-pocket costs of those services to its customers.

99.     On information and belief, Penske's wrongful charging practices have resulted in a significant amount of maintenance charges billed to, and collected from, its customers.

100.    Penske's routine wrongful service charges breach the express provisions of the VLSAs it has entered into with its customers.

101.    Penske has been able to hide these wrongful charges because it exerts complete control over the service process and is thus capable of covering up any and all of its actions in this regard.  First, Penske maintains complete control over all aspects of the process for servicing the vehicles.  Penske controls and operates the service centers where customers are required under the VLSA to bring the trucks for all service work.  Penske controls the mechanics and technicians within those service centers that perform the work (or has authority to designate any third parties that are permitted to perform the work).  Penske controls what work is completed and how it is

---

[16] Notably, Penske's responsibility for service work extends not only to "maintenance" but also all replacements and repairs necessary to keep the vehicles in good repair and operating condition. And the customer's responsibility is limited to only certain types of damage repairs, namely damage caused by the customer, third parties, or casualty. *See supra* ¶¶ 68–69.  For convenience, this section describes Penske's responsibility as covering "maintenance" and the customer's responsibility as covering "damage repair," but these terms should not be read as either limiting the scope of Penske's responsibility or broadening the scope of the customer's responsibility.

recorded for bookkeeping and billing purposes—i.e., damage-related repairs or maintenance. And Penske controls how service work that is completed is invoiced to the customers because it is the one that crafts the description of the charges, and thereby, has significant leeway and no oversight in doing so. Penske then requires prompt payment of all charges, even those that a customer may dispute.

102. By contrast, the customer has very limited visibility into the service process. If the customer has any representative at the service centers when service work is performed, it is the individual assigned to drive the truck, who is not a truck mechanic, has no knowledge regarding the divisions of responsibility for service costs under the customer's VLSA, and often has no visibility into what work is needed or being completed.

103. Indeed, the customer ordinarily does not know what service work was performed on its leased trucks, even when a truck driver may be on site—nor how Penske categorized the service work for billing purposes—until after the work is completed when Penske sends its invoices. And because customers are only supposed to be responsible for damage repair, a customer would generally not be monitoring its account for charges for maintenance—which it should not be receiving at all since maintenance is Penske's responsibility under the VLSA.

104. Second, when the customer receives its invoice for purported damage repair charges, that invoice will ordinarily contain several pages of charges, including lease charges and service charges. But payment is due promptly on the invoice (usually either within 7 days of the invoice itself or by a specified recurring monthly deadline), and so it is rarely feasible for customers to independently review each service charge (many of which are individually small dollar amounts) to determine whether the charge was properly billed to the customer as damage repair or whether it should have been covered by Penske as maintenance.

105.    Third, Penske's descriptions of service work that it provides to customers are often unclear, such that in many instances a customer is unable to ascertain whether charges were properly billed to the customer as damage repair. Penske has no incentive to provide detailed descriptions for the wrongful charges because doing so would potentially enable customers to more easily dispute them.

106.    Penske has admitted that information it has provided regarding charges was inadequate to allow for a determination of why the charges were the customer's responsibility. Yet, again, since the service process is entirely within Penske's control, there is no mechanism for the customer to get better information about service being performed, short of asking Penske, and then Penske often fails to provide it.

107.    Fourth, under the VLSA the customer still must pay all charges in full without any deduction. Full payment is required under the VLSA even if a customer has a dispute as to the correctness of any charges. Thus, a customer cannot withhold payment for any charges it disputes, otherwise it would default on the VLSA as to its entire fleet of Penske trucks, and Penske would be permitted to immediately repossess the trucks and impose other significant penalties on the customer.

108.    The only way for a customer to dispute wrongful charges is to first pay the charges and then try to resolve the dispute with Penske after Penske has already been paid in full. On information and belief, when a customer does raise a dispute, Penske often simply refuses to meaningfully engage in resolving the disputed charges, frequently not even getting back to the customer. Again, Penske has no incentive to meaningfully engage with customers raising disputes: Penske has already been paid for the disputed charges, Penske controls all of the information regarding the disputed charges, and there is no procedure under the VLSA to compel Penske to

substantiate (or even explain) disputed charges. Because Penske's full service truck leases are supposed to be a way to reduce administrative burdens, customers are often ill-equipped to constantly screen for or investigate abuses in the billing practices. Given that a customer must pay disputed charges first and then later attempt to recover the funds from Penske, it is generally not feasible or economical for customers to raise disputes, particularly given that the wrongful individual service charges are presented as small dollar expenses and buried within large, detailed invoices. As explained, customers cannot withhold payment of charges—even small ones— without triggering a default event (*see supra* ¶¶ 75–78), and Penske is thus able to continuously impose wrongful charges throughout the lease term without any consequence. These expenses add up over time and over the course of thousands of class members, such that Penske is able to shift onto its customers substantial amounts of maintenance costs (that benefit itself because their owned trucks are kept in working condition at its customers' expense) that it is contractually obligated to bear under the VLSA.

109. To compound matters, Penske also routinely automatically debits service charges in full by way of ACH payment from its customers' financial accounts. The debit is automatic and initiated by Penske. The customer cannot withhold the funds or delay the payment, even if it has a dispute regarding any service charges. On information and belief, Penske rarely (if ever) addresses customers' disputes over services charges before automatically debiting payment for the charges. Thus, a customer seeking to dispute a charge must pay the charge in full and then attempt to convince Penske to refund the payment. Penske's wrongful cost-shifting in this manner is particularly abusive in light of its several years of service and diagnostic delays. In other words, Penske is forcing its customers to pay maintenance costs that they are not required to pay, while at the same time failing to timely complete the work.

**Penske's Wrongful Conduct in Breach of the VLSA**

110.    **Wrongful Service Charges:**  Under the VLSA, in exchange for the customer's monthly lease and mileage payments for its trucks, Penske is responsible, at its own cost, for all preventative maintenance, replacements, and other ordinary services necessary to keep the trucks in operating condition.  Penske violates this requirement by wrongfully charging customers for some of these services.  Penske's violations inflict damages upon customers in the amount of the wrongful charges that the customer should not have had to pay.

111.    **Excessive and Unreasonable Service Delays and Truck Downtime:**  Under the VLSA, Penske is required to complete all service work in a timely fashion under at least the "reasonable period of time" and "time is of the essence" provisions.  Penske violates this requirement by failing to complete services (including diagnosing what services are needed) in a timely fashion.  The resulting excess downtime to the customer's trucks inflicts damages because the customer is required to pay the full month's lease payment for trucks that were inoperable for part of the lease period because of Penske's breach.  Further, the excess downtime inflicts additional damages on customers in the form of lost profits and lost business.

**Facts Specific to Class Representative**

**I.    Lilium Group and XIM**

112.    Plaintiff Lilium Group is a private equity firm that acquires and manages various businesses, including those in the transportation and logistics industry.

113.    In 2021, Plaintiff, through its managed investment funds, acquired a controlling interest in XBL Holdings LLC, the ultimate corporate parent of XBL Industrial Materials LLC ("XIM").

114.    In September 2021, XIM acquired the assets of a trucking and logistics company, Spotted Lakes, LLC (Spotted Lakes).  Spotted Lakes was a Penske customer pursuant to a VLSA

under which it leased 67 semi-trailer trucks.  **Exhibit A** is a copy of the May 2018 VLSA between Spotted Lakes and Penske.

115.    As part of XIM's acquisition of Spotted Lakes' assets, XIM also assumed Spotted Lakes' VLSA with Penske pursuant to a "Full Assignment & Assumption" agreement entered between Spotted Lakes, XIM, and Penske in October 2021.  *See* **Exhibit B**.

116.    Plaintiff, through its managed investment funds, held a controlling interest in XIM and its operations from September 2021 through November 2024.  During that time, XIM was engaged in the business of transporting industrial materials such as sand, salt, lime, and limestone.

117.    In this period, XIM used the trucks leased under the Penske VLSA for its business. XIM paid its lease and service charges as invoiced under the VLSA.

## II.    Excessive and Unreasonable Service Delays and Truck Downtime

118.    Beginning in around mid 2018 when Spotted Lakes first entered into the VLSA, and continuing through the end of the lease period in 2024, Spotted Lakes, and then XIM, experienced unusually long and unreasonable delays for service work at Penske's service centers. All types of service work were being unduly delayed, including for minor jobs, such as routine or preventative maintenance or replacements.  These services would often take multiple days (or sometimes over a week) to complete, despite industry standards and contractual requirements for them to be completed more promptly.

119.    Penske's service delays and the resulting excess truck downtime caused loss of profits and extensive disruptions in XIM's business, such as harming its ability to service its customers and to retain its drivers.  XIM also lost the ability to use the trucks during the excess downtime period, despite having to pay the full monthly lease fees for these trucks.  Those losses

would not have occurred had Penske adequately operated its service centers to meet its obligations to customers under the VLSA, including by maintaining sufficient staffing and inventory.

120.    When XIM raised with Penske the issue of the ongoing service delays (which it did on multiple, repeated occasions), Penske admitted that its service centers were understaffed and that unreasonable service delays were impacting its customers across the country, not just plaguing XIM.  Yet despite its admission, Penske took no material action to remedy the continuing and excessive service delays.  On information and belief, discovery will reveal additional failures and deficiencies contributing to Penske's breach of its service obligations to XIM and other customers.

### III.    Wrongful Service Charges

121.    XIM also raised with Penske several service charges that XIM had paid but, based on Penske's descriptions of the charges, appeared to have been for maintenance work (which Penske is required under the VLSA to cover at its own expense).  XIM disputed service charges both by using Penske's customer portal and by bringing disputes directly to the attention of Penske representatives.

122.    For months, XIM and Penske engaged in discussions regarding the disputed charges.  Central to those discussions was XIM's request that Penske substantiate the disputed charges.  XIM asked Penske—repeatedly—to provide evidence that the disputed charges were for damage repairs that XIM was required to pay under the VLSA, as opposed to maintenance charges for which Penske was responsible.  Yet despite XIM's repeated requests, and Penske's purported assurances that it would do so, Penske failed to ever provide evidence to substantiate the disputed charges.

123.    As previously explained, *see supra* ¶¶ 101–105, Penske has control over the entire process and all of the information regarding service on the trucks.  Thus, XIM, like any Penske

customer, would have no way to evaluate the disputed charges other than asking Penske for more information.

124.    At the time it paid the disputed charges, XIM reasonably expected that Penske would, consistent with the VLSA, bill XIM only for service work for damage repairs for which the customer is responsible under the VLSA—not for maintenance, which is Penske's responsibility.  Penske chose to abuse its position of trust and unilateral control of information to systematically overbill XIM.  The charges were never substantiated nor refunded.

125.    Analysis of Penske's service records reveals multiple charges to XIM that appear to be for routine or preventative maintenance.  Penske provides a customer portal through which its customers may view Penske's descriptions of service charges (and which can be used to easily generate a list of all charges and descriptions in Excel format).

126.    For example, in April 2023 Penske charged XIM approximately $2,700 for replacing an air filter.  Penske's description as shown in its customer portal records was, in material part, as follows:

| Complaint | Cause | Correction | Job Notes |
|---|---|---|---|
| HEATER/AC DEFROSTER/DEFOG DOES NOT OPERATE PROPERLY | AIR FILTER HOUSING FILLED FULL OF MATERIAL | REPLACE / REPAIR ACCIDENT / INCIDENT DAMAGE | REPLACE / REPAIR ACCIDENT/INCIDENT DAMAGE |

127.    Air filters in vehicles get dirty or "full of material" over time; this is the purpose of an air filter, and part of its ordinary wear and tear.  In fact, for that very reason, blowing air to clean filters is required as part of any routine preventative maintenance review of a truck.

128.    Yet other than conclusory references to "accident/incident" or "damage" Penske provided no basis for its determination that XIM was responsible for the cost of replacing this filter.

129.    Another example is a May 2023 charge for approximately $290 for replacing a fog light bulb. Penske's description in the portal was, in material part, as follows:

| Complaint | Cause | Correction | Job Notes |
|---|---|---|---|
| FOG LIGHT INOPERATIVE | BULBS BURNT OUT | REPLACE FOG LIGHT BULB-BOTH | REMOVE FOG LIGHT ASSEMBLY; REPLACE FOG LIGHT BULB; REINSTALL; VERIFY OPERATION |

130.    Fog light bulbs, like any light bulbs, burn out over time and need to be replaced; this is part of ordinary wear and tear for a light bulb.

131.    Yet Penske's description provides no explanation for why XIM was required to pay the cost of the $290 replacement.

132.    Another example is an approximately $4,900 charge for a wiring harness repair in May 2024. Penske's description in the portal was, in material part, as follows:

| Repair Desc | Complaint | Cause | Correction |
|---|---|---|---|
| ACCIDENT/INCIDENT | CEL | MCM HARNESS DAMAGE DUE TO CHAFFING | REPLACE ENGINE MFG WIRING HARNESS |

133.    The description indicates that the wiring harness was damaged due to "chaffing" and that Penske replaced it. But, similar to a filter being filled with filtered particulate matter, wiring harness chaffing is ordinarily wear and tear that will occur over time when the truck is used normally. This type of wear would generally be mutually exclusive from damage caused by an accident or unusual event.

134.    Yet, other than the reference to "ACCIDENT/INCIDENT," the description contains no information to explain why the $4,900 charge was XIM's responsibility.

135.    Another example is Penske's description in the portal for an approximately $31,000 charge in April 2024 to repair a dusted engine. The description was, in material part, as follows:

| Repair Desc | Complaint | Cause | Correction |
|---|---|---|---|
| ACCIDENT/INCIDENT | POSSIBLE DUSTED ENGINE | SAND MADE IT PASS THE AIR FILTER AND DAMAGED MULTIPLE INTERNAL COMPONENTS | REPLACE / REPAIR ACCIDENT / INCIDENT DAMAGE |

136.    This description is problematic because dusted engines are common in the ordinary course of operating a semi-trailer truck. It means that dust or dirt bypassed the engine's filtration system and entered the combustion chamber, causing friction, wear, and contamination to the engine's internal machinery.

137.    Although trucks are often exposed to dust and dirt in the ordinary course of use, dusted engines should ordinarily not occur as long as the relevant component parts are properly installed and regular preventative maintenance is being conducted (e.g., regular air filter replacements, inspecting intake system for leaks, ensuring proper sealing, etc.).[17] If a dusted engine does occur, this would generally be expected to be caused by a failure to perform adequate preventative maintenance and replacements over time. Because preventative maintenance and replacements are Penske's responsibility, a dusted engine would not generally be the fault of the customer or any third party (hence, the cost of repairing the dusted engine should not be XIM's responsibility under the VLSA).

---

[17] *See, e.g.*, National Fleet Management, *Common Mistakes In Heavy-duty Truck Engine Maintenance And How To Avoid Them*, https://www.nationalfleetmgt.com/articles/common-mistakes-in-heavy-duty-truck-engine-maintenance-and-how-to-avoid-them ("The air filter in your truck's engine prevents contaminants like dust, dirt, and debris from entering the engine. Neglecting air filter replacements can lead to clogged filters, reduced airflow, and decreased engine efficiency. In the worst-case scenario, it can even cause engine damage. Remember, preventing engine damage is far quicker and cheaper than repairing it.") (last visited Mar. 17, 2026).

138. This type of service, as with any other type of routine maintenance and repair to keep the vehicle in good working condition, was Penske's responsibility under the VLSA.

139. Penske nonetheless charged XIM for the full amount of the April 2024 dusted engine repair—approximately $31,000.

140. Yet other than a vague reference to an unspecified "ACCIDENT/INCIDENT" in Penske's description of the charge, Penske wholly failed to explain why the repair was anything other than ordinary maintenance.

141. When repeatedly asked by XIM, Penske failed to provide any information or evidence for why the April 2024 dusted engine charge was XIM's responsibility to pay under the VLSA.

142. On at least one other occasion, Penske did cover a dusted engine repair, yet nonetheless charged XIM for the April 2024 dusted engine repair, among others, without explaining why.

143. The above are just a few examples of the countless charges that were within Penske's control but that Penske either arbitrarily or deliberately mis-designated to XIM forcing XIM to cover those expenses.

144. The harm caused to XIM by the above and other wrongful charges was exacerbated by Penske's payment system.  Under the VLSA, Penske required that XIM pay its lease and service charges in full via automated ACH draws that Penske initiates.

145. Under this system, Penske would debit XIM's account for the full amount of the charges following each invoice, such that even if XIM had concerns about particular charges (or any other issues regarding Penske's performance, including the service delays), XIM still had to pay Penske in full and attempt to raise issues with Penske after the fact.  Withholding payment

would result in a default under the VLSA and allow Penske to immediately repossess the trucks and impose other penalties.

## IV. End of the Business Relationship

146. Faced with the ongoing service delays, wrongful charges, and other issues, XIM entered into discussions with Penske regarding termination of the VLSA. After some negotiation, the parties reached an agreement under which XIM would purchase from Penske the trucks it had been leasing under the VLSA. In late 2024, the parties terminated the VLSA and entered into a sales agreement for the trucks. In doing so, they expressly agreed that XIM reserved all rights with regard to XIM's claims against Penske arising from or relating to Penske's abusive practices around its implementation of the VLSA.

147. XIM's purchase of the trucks from Penske ended the business relationship between XIM and Penske.

## V. Plaintiff Sells XIM and Obtains an Assignment of Claims Against Penske

148. In late 2024, and following XIM's purchase of the trucks, Plaintiff entered into a stock purchase agreement for the sale of all shares of XIM's parent company, XBL Holdings LLC and its subsidiaries (including XIM), to a third party, Keenan Advantage Group, Inc. (KAG).

149. Further, in connection with the stock purchase agreement, Plaintiff, through its managed investment funds, entered into an agreement with KAG in 2025 under which KAG assigned to Plaintiff all of XIM's claims, actions, and other rights against Penske arising out of the VLSA.

150. Plaintiff therefore brings this action as XIM's assignee.

### Class Action Allegations

151. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

152.    Plaintiff brings this action on behalf of itself and as a class action, pursuant to the provisions of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and on behalf of the following class (the "Class"):

a.    All persons, including business entities, in the United States, who are or were counterparties to a VLSA with Penske in the four (4) years immediately prior to the filing of this Complaint.

153.    Excluded from the Class are Penske's officers, directors, limited partners, general partners, or officers or directors of limited or general partners, and any of Penske's affiliates, parents, subsidiaries, employees, successors, or assigns.  Also excluded from the Class are the judicial officers or their immediate family members and Court staff assigned to this case.

154.    Plaintiff reserves the right to modify or amend the Class definition as appropriate during the course of this litigation.

155.    Certification of Plaintiff's claims for class-wide treatment is appropriate because the elements of Plaintiff's claims can be proven on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

156.    This action has been brought and may be properly maintained on behalf of the proposed classes pursuant to Federal Rule of Civil Procedure 23.

I.    Numerosity:  Fed. R. Civ. P. 23(a)(1)

157.    The members of the Class are so numerous that joinder of all members is impracticable.

158.    On information and belief, there are thousands of members of the Class.  Although the precise number is unknown to Plaintiff, such number would be easily ascertainable from Penske's records, which would be expected to show all customers with whom Penske had or has

a VLSA. The Class likely contains all of Penske's full-service commercial truck leasing customers since 2022.

159. Members of the Class may be notified that this action is pending through recognized Court-approved notice dissemination methods, which may include U.S. mail, e-mail, internet postings, and/or published notice.

**II.     Commonality and Predominance:  Fed. R. Civ. P. 23(a)(2) and (b)(3)**

160. This action involves common questions of law and fact that predominate over individualized questions, including, without limitation:

     a.    Whether Penske maintained a pattern and practice of wrongfully charging VLSA customers for preventative maintenance, replacement parts, and other ordinary (non-damage repair) services;

     b.    Which types of charges constitute maintenance or other service for which Penske is responsible, and which types of charges constitute damage repair for which customers are responsible;

     c.    Whether Penske's wrongful service charges breach the VLSA;

     d.    Whether Penske's service centers were inadequately staffed, supplied with inventory, or otherwise operated to handle its service obligations to customers; and

     e.    Whether excess downtime caused by unreasonable service delays violates the "reasonable period of time" and "time is of the essence" provisions under the VLSA.

**III.    Typicality:  Fed. R. Civ. P. 23(a)(3)**

161. Plaintiff's claims are typical of the claims of other class members because, among other things, all such members are or were similarly situated and were comparably injured through Penske's wrongful conduct as set forth herein.

162. Plaintiff is the assignee of XIM's claims against Penske.

163. Thus, Plaintiff's claims arising under or related to the VLSA would be of the same nature as claims of other Class members—i.e., customers of Penske under VLSA agreements.

## IV.    Adequacy:  Fed. R. Civ. P. 23(a)(4)

164.    Plaintiff is an adequate class representative, because its interests do not conflict with the interests of other members of the classes it seeks to represent.

165.    Plaintiff has retained counsel who are qualified, competent, diligent, and experienced in complex litigation and class actions, and capable of conducting the litigation.

166.    Plaintiff and counsel intend to prosecute the case vigorously such that the interests of the Class will be fairly and adequately protected.

## V.    Superiority:  Fed. R. Civ. P. 23(b)(3)

167.    A class action is superior to other available means for the fair and efficient adjudication of this action.  No unusual difficulties are likely to arise in the management of the class action.

168.    Damages suffered by Plaintiff and Class members, while material, may not be so significant that filing an individual claim for such damages would be feasible.  Thus, many Class members would otherwise lack the ability or financial incentive to individually seek redress for Penske's wrongful conduct.

169.    For Class members who are current customers of Penske, it may not be possible for those businesses to file individual claims (despite the ongoing damages addressed herein) given that such businesses would be entirely dependent on Penske for their trucks.  Those customers would, similarly, lack the ability to individually seek redress.

170.    A class action would also make the litigation more manageable.  Individualized litigation of the multiple common issues regarding a common contract (the VLSA) would run the risk of inconsistent treatment and outcomes among similarly-situated parties.  Individualized

litigation would also require costly and inefficient re-litigation of common issues. A class action would avoid these undesirable results.

## VI.    Certification of Classes as to Particular Issues:  Fed. R. Civ. P. 23(c)(4)

171.    In the event that the Class described above does not meet the requirements of Rules 23(a) or 23(b)(3), Plaintiff requests certification of a class or classes as to particular issues that will drive the litigation toward a resolution pursuant to Federal Rule of Civil Procedure 23(c)(4).

### COUNT 1
### BREACH OF CONTRACT—WRONGFUL SERVICE CHARGES
### (Plaintiff and Members of the Class v. Defendant)

172.    Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

173.    Plaintiff brings this count on behalf of itself and members of the Class as defined above.

174.    Plaintiff and the other Class members were or are parties or real parties in interest to a VLSA with Penske.

175.    The VLSA is an enforceable contract, supported by consideration, between Penske and XIM (Plaintiff's assignor).    Each Class member's VLSA is similarly supported by consideration and enforceable as between Penske and such Class member.

176.    The VLSA specifically delineates which types of service charges are to be paid by the customer and which types are to be paid by Penske.

177.    Under the VLSA, the customer is responsible for paying the costs of all repairs of damage to a vehicle resulting from customer misuse, third parties, or unusual events.

178.    Under the VLSA, Penske is responsible for:

      a.    all preventative maintenance, replacement parts and repairs to keep the vehicles in good repair and operating condition;

b. oil and lubricants necessary for the efficient operation of the Vehicles;

c. all necessary tires as a result of any impact, curbing, or puncture damage or other accident, incident or Misuse; and

d. road service because of mechanical and tire failures not attributable to Misuse or other violation of this VLSA.

179. Penske routinely charged XIM maintenance and other expenses for which Penske was contractually responsible under the VLSA.

180. On information and belief, Penske maintains a pattern and practice of regularly—and potentially knowingly—charging its VLSA customers (Class members) for large amounts of maintenance charges that are Penske's responsibility under the VLSA.

181. Penske's wrongful charges for maintenance or other services for which Penske is responsible violate the VLSA as between Penske and Class members, including its express provisions and the covenant of good faith and fair dealing implied in all contracts as a matter of law.

182. As a direct and proximate result of Penske's breaches, Plaintiff and Class members have incurred actual damages in at least the amount of the wrongful charges, which they should not have been required to pay.

**COUNT 2**
**BREACH OF CONTRACT—EXCESSIVE AND UNREASONABLE SERVICE DELAYS AND TRUCK DOWNTIME**
**(Plaintiff and Members of the Class v. Defendant)**

183. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

184. Plaintiff brings this count on behalf of itself and members of the Class as defined above.

185.    Plaintiff and the other Class members were or are parties or real parties in interest to a VLSA with Penske.

186.    The VLSA is an enforceable contract, supported by consideration, as between Penske on the one hand and XIM (Plaintiff's assignor) on the other.  Each Class member's VLSA is similarly supported by consideration and enforceable as between Penske and such Class member.

187.    The VLSA provides that if a Vehicle is disabled because of mechanical or tire failure, Penske shall, within a reasonable period of time after receipt of notification, properly repair, or cause the repair of, the Vehicle.

188.    The VLSA also contains a "time is of the essence" provision requiring service to be promptly completed, which is consistent with industry custom and part of the overall purpose of the leasing arrangement.

189.    Penske has maintained inadequate staffing and inadequate inventory of parts at its service center locations since at least 2019.

190.    Penske's mismanagement of its service center locations, including at least its inadequate staffing and inventory issues, cause it to routinely fail to timely complete service work on trucks leased pursuant to VLSAs as between Penske and XIM (Plaintiff's assignor) or Penske and the Class members.

191.    Penske's unreasonable delay in timely completing service work results in excess downtime for the trucks, causing the trucks to sit in the service centers for excess days awaiting completion, rather than operating and supporting class members' businesses.

192.   Penske's failure to timely complete service work breaches the VLSA, including its express provisions and the covenant of good faith and fair dealing implied in all contracts as a matter of law.

193.   As a direct and proximate result of Penske's breaches, XIM (Plaintiff's assignor) and Class members were damaged by Penske's failures in, at minimum, the pro rata shares of the full lease payments paid monthly reflecting the amount of excess downtime in each month.

## JURY DEMAND

194.   Plaintiff and the putative Class demand a jury trial in this action on all issues so triable.

## CONCLUSION AND PRAYER FOR RELIEF

195.   This Court can finally make Penske accountable for the wrongful practices in which it has engaged with its customers in breach of the VLSA.

196.   WHEREFORE, Plaintiff, individually and on behalf of members of the Class, prays for judgment in its favor, in favor of the Class, and against Defendant as follows:

  a.  Certifying a class as proposed herein;

  b.  Designating Plaintiff as the class representative;

  c.  Appointing undersigned counsel as class counsel;

  d.  Determining that Penske shall be responsible for all costs of notifying class members during the pendency of this action;

  e.  Scheduling a jury trial in this matter;

  f.  Finding and adjudicating that Penske has breached the VLSA as pled in this Complaint;

  g.  Awarding all monetary damages available under the law;

  h.  Awarding Plaintiff's counsel reasonable attorneys' fees and class counsel fees, along with costs and expenses as permitted by law;

    i.   Awarding pre- and post-judgment interest on any amounts awarded as permitted by law; and

    j.   Awarding all other relief which the Court deems just and proper.

Date   March 31, 2026               Respectfully submitted,

                                       */s/ Joshua D. Snyder*
Joshua D. Snyder
Pennsylvania Bar No. 88657
Patrick Howard
Pennsylvania Bar No. 88572
**SALTZ MONGELUZZI BENDESKY P.C.**
One Liberty Place
1650 Market Street, 52nd Floor
Philadelphia, Pennsylvania 19103
Tel.:  +1 215.525.8221
Fax:  +1 215.496.0999
jsnyder@smbb.com
phoward@smbb.com

Katherine G. Treistman*
Andrew D. Bergman*
Will Coltzer*
**ARNOLD & PORTER KAYE SCHOLER LLP**
811 Main Street, Suite 1800
Houston, Texas 77002–2755
Tel.:  +1 713.576.2400
Fax:  +1 713.576.2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Will.Coltzer@arnoldporter.com

Evan Rothstein*
Patrick Hall*
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth Street, Suite 3100
Denver, Colorado 80202–2848
Tel.:  +1 303.863.1000
Fax:  +1 303.863.2301
Evan.Rothstein@arnoldporter.com
Patrick.Hall@arnoldporter.com

Natalie Steiert\*
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., NW
Washington, DC 20001–3743
Tel.:  +1 202.942.5000
Fax:  +1 202.942.5999
Natalie.Steiert@arnoldporter.com

\* *Pro Hac Vice* is forthcoming

*Attorneys for Plaintiff and the Proposed Class*